**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MIGUEL LOPEZ, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:08-CV-3377-JOF |
| OFFICER RICHARDSON of the City | : | |
| of Atlanta Police Department, | : | |
| in his Individual and Official Capacity, | : | |
| and THE CITY OF ATLANTA, | : | |
| | : | |
| Defendants. | : | |

**OPINION AND ORDER**

This matter is before the court on Defendant City of Atlanta's motion to dismiss [4].

I.      **Background**

A.      **Procedural History**

Plaintiff filed suit against Defendants, Officer Richardson of the Atlanta Police

Department in his individual and official capacities, and the City of Atlanta, pursuant to 42

U.S.C. § 1983, alleging Fourth and Fourteenth Amendment constitutional violations arising

out of an incident outside of the "Peek-A-Boo" club in Atlanta, Georgia.  In addition to the

constitutional violations, Plaintiff also alleges violations of the law of nations, specifically,

torture; cruel, inhumane, and degrading treatment of a minor; and arbitrary detention.

Finally, Plaintiff raises state law claims of assault, battery, and intentional infliction of emotional distress. Plaintiff seeks punitive damages under his federal and state law claims. In an order dated December 16, 2008, the court held that Plaintiff could proceed without a guardian ad litem despite the fact he is a minor. The court also ruled that Plaintiff could not proceed anonymously and directed Plaintiff to amend his complaint accordingly.

### B.    Facts

In his complaint, Plaintiff alleges that Officer Richardson was called to the scene to respond to a dispute Plaintiff was having with the cashier of the club. Plaintiff avers that during his interaction with Officer Richardson, the officer struck Plaintiff on the wrist with his patrol baton and then kicked and punched Plaintiff repeatedly while he was on the ground. Plaintiff contends Officer Richardson grabbed Plaintiff's head by the hair and repeatedly shoved Plaintiff's face into the pavement. Plaintiff eventually lost consciousness but was handcuffed and dragged to Officer Richardson's police car. Officer Richardson then drove Plaintiff into DeKalb County to an unlit parking lot and stopped the car. Officer Richardson pulled Plaintiff out of the police cruiser, removed the handcuffs, and dumped Plaintiff in the parking lot. Plaintiff stumbled to a nearby apartment building where a resident saw Plaintiff and called an ambulance and the police. Plaintiff was taken to Grady Hospital and admitted for treatment. *See* Cmplt., ¶¶ 14-74.

AO 72A
(Rev.8/82)

Plaintiff's complaint labels his causes of action without specifying the defendants to which these claims are applicable. *See generally* Complaint. He alleges that Defendant Richardson "acting under color of law" violated norms of international law. *Id.*, ¶ 78. He then separates his international law claims into Count I: Torture, Count II: Cruel, Inhuman, Degrading Treatment or Punishment of Minor; and Count III: Arbitrary Detention. He goes on to aver that Defendant Richardson was "a public official and/or acting in an official capacity" when he "intentionally caused the Plaintiff severe physical and mental pain." *Id.*, ¶¶ 92-93, 113-14, 131. Plaintiff also refers only to acts of Defendant Richardson in his state law counts.

The only specific reference he makes to the City of Atlanta is with respect to his federal § 1983 claims under the Fourth and Fourteenth Amendments. There, Plaintiff alleges:

> that the violation of his constitutional rights were [sic] caused by implementation of a custom, policy, or official act of Defendant City of Atlanta including but not limited to: a police department custom or policy of tolerance of physical mistreatment of Spanish-speaking immigrants; failure to properly screen applicants for the position of police officer with the City of Atlanta; failure to supervise police officers; failure to train police officers in dealing with minors and Spanish-speaking immigrants; failure to investigate allegations of misconduct similar to that alleged in this Complaint; failure to discipline police officers who engage in conduct similar to that alleged in this complaint.

*Id.*, ¶¶ 150, 161 (similar allegations with respect to Fourteenth Amendment). In all other respects, Plaintiff's complaint refers only to the actions of Defendant Richardson.

3

4

### C. Contentions

In this litigation, Defendant the City of Atlanta and Defendant Officer Richardson are represented by different counsel. Although the City of Atlanta has filed a motion to dismiss, Officer Richardson has not done so and has filed an answer to Plaintiff's complaint. In its motion to dismiss, the City of Atlanta argues that (1) the official capacity claims raised against Defendant Richardson should be dismissed as redundant because they are in reality claims against the City of Atlanta; (2) although Plaintiff alleges both Fourth and Fourteenth Amendment claims concerning the use of excessive force against him, those claims arise only under the Fourth Amendment and not the Fourteenth; (3) Plaintiff makes no allegations of how any custom or policy of the City of Atlanta led to his constitutional injuries and therefore the § 1983 claims against Atlanta should be dismissed; and (4) (a) Plaintiff's complaint does not raise state law or international law claims against the city; and (b) even if the complaint is read as raising such claims, Plaintiff's allegations do not rise to the level of a violation of international law and Plaintiff's state law claims against the City fail because the City is entitled to sovereign immunity.

Plaintiff responds that he can raise both Fourth and Fourteenth Amendment claims because he was not "seized" at the time Defendant Richardson utilized excessive force against him. Further, because there is no heightened pleading requirement with respect to municipalities, his mere allegation in the complaint that his injuries were sustained as a

5

result of the City's customs and policies, Plaintiff argues, is sufficient to survive a motion to dismiss. Finally, Plaintiff argues that corporations, such as the City of Atlanta, can be held liable for violations of international law.

## II.    Discussion

### A.    Preliminary Matters

Because Plaintiff did not respond to Defendant Atlanta's motion to dismiss state law claims on the basis of sovereign immunity, the court grants that portion of Defendant's motion and dismisses state law claims against the City of Atlanta. *See Reese v. City of Atlanta*, 261 Ga. App. 761, 762 (2003). Further, Plaintiff did not oppose Defendant Atlanta's assertion that the claims against Defendant Richardson in his official capacity should be dismissed as redundant of his claims against the City of Atlanta. Therefore, the court finds that Plaintiff's claims against Defendant Richardson will proceed in his individual capacity only.

### B.    Source of Constitutional Injury

The parties dispute whether Plaintiff's claims should proceed on the basis of the Fourth Amendment only or also under the Fourteenth Amendment. Plaintiff's complaint clearly alleges that Defendant Richardson used improper physical force against Plaintiff during the altercation in front of the nightclub.

6

In *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), the Eleventh Circuit addressed whether the Fourteenth Amendment covered a plaintiff's allegation of excessive force. There, the plaintiff and his wife became involved in an argument when she told him she wanted to end their marriage and return to Puerto Rico. The plaintiff threatened suicide and even wrapped a telephone cord around his neck and attached the other end to a ceiling vent. He used a kitchen knife to make cuts on his arm.

The wife called the City of Orlando Police Department and reported the attempted suicide. Officers arrived at and entered the apartment. The plaintiff would not respond to the officers' requests to drop the knife and eventually the officers fired a Sage SL6 Launcher at the plaintiff in an attempt to subdue him. The Sage Launcher device has the force of a professionally-thrown baseball and is a device designed to protect persons from self-inflicted injury. Although the officer aimed at the plaintiff's shoulder, the launcher hit the plaintiff in the head, fracturing his skill and resulting in brain injuries. The plaintiff sued the officers *inter alia* under the Fourth and Fourteenth Amendments. The Eleventh Circuit analyzed the plaintiff's claims under the Fourth Amendment. Under these circumstances which the court agreed did not involve a "criminal arrest," the court stated that Plaintiff's "alternative" Fourteenth Amendment argument

> is without merit because there is no question that [plaintiff] was in custody at
> the time of the seizure. A suspect is in custody whenever an officer "restrains
> the freedom of a person to walk away, he has seized that person." *Tennessee
> v. Garner*, 471 U.S. 1, 7 (1985) (citing *United States v. Brignoni-Ponce*, 422

7

U.S. 873 (1975)).  Because the police surrounded [plaintiff] and there was no way for him to escape, he was "seized" for the purposes of the Fourth Amendment.  Even if [plaintiff] was not seized at the point when he was surrounded by police, he was seized at the time he was struck by the projectile from the Sage Launcher.  *See Carr v. Tantangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003).

*Id.* at 1154 n.1.

In *Carr*, 338 F.3d 1259 (11th Cir. 2003), the plaintiffs also had an altercation with the police.  One plaintiff was shot by an officer and the other was on the scene but not injured.  The Eleventh Circuit held that the claims of the plaintiff who was shot were covered by the Fourth Amendment, but the Fourteenth Amendment substantive due process analysis applied to the other plaintiff "because he was not impacted physically in the shooting."  *Id.* at 1267 & n.15.

The court quoted *Graham v. Connor*, 490 U.S. 386, 395 (1989), for the proposition that

> *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than a 'substantive due process' approach.  Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.

*Id.* (noting also that *Graham* court found "seizure" occurs when government actors through physical force or show of authority have restrained the liberty of a citizen); *see also Wilson*

8

*v. Northcutt*, 987 F.2d 719, 722 (11th Cir. 1993) ("a non-seizure Fourteenth Amendment substantive due process claim of excessive force survives *Graham*").  The court also noted that an intentional seizure "readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."  *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

Because Plaintiff's complaint contains allegations that Defendant Richardson used excessive physical force on him, the court concludes Plaintiff was "seized" and his federal constitutional claim arises under the Fourth Amendment and not the Fourteenth Amendment.[1]

### C.    Section 1983 Claims Against City of Atlanta

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities (and other local government entities) are "persons" within the meaning of 42 U.S.C. § 1983.  The Court, however, consistently has declined to hold municipalities liable under a theory of respondeat superior.  *See*, *e.g.*, *Pembaur v.*

---

[1]Plaintiff's citation to *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997), is unavailing.  *Lanier* states that not all physically abusive claims arise under the Fourth or Eighth Amendments but that *Graham* holds only if a constitutional claim is covered by either the Fourth or Eighth Amendment, the claim must be analyzed under the standard of that particular provision and not under the broader standards of substantive due process.  As the court explained above, *Graham* clearly holds that under the circumstances described by Plaintiff in his complaint, his excessive force claims are covered by the Fourth Amendment and, therefore, *Lanier* instructs it would be improper to proceed to a Fourteenth Amendment analysis.

AO 72A
(Rev.8/82)

*Cincinnati*, 475 U.S. 469, 479 (1986). Rather, a plaintiff must demonstrate a municipal "policy" or "custom" that caused the plaintiff's injury in order to establish a municipality's liability. *See*, *e.g.*, *Canton v. Harris*, 489 U.S. 378, 389 (1989). The plaintiff must also show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original). To impose liability on the City of Atlanta for failing to act to preserve a constitutional right under section 1983, Plaintiff must show (1) that his constitutional rights were violated; (2) that the City of Atlanta had a policy or custom that constituted a deliberate indifference to his constitutional rights; and (3) that the violations were caused by the policy or custom. *See Canton*, 489 U.S. at 388.

There is no heightened pleading requirement with respect to municipal defendants in § 1983 litigation. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993). Even under *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), a complaint must only contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1964.

Here, Plaintiff has alleged:

that the violation of his constitutional rights were [sic] caused by implementation of a custom, policy, or official act of Defendant City of Atlanta including but not limited to: a police department custom or policy of tolerance of physical mistreatment of Spanish-speaking immigrants; failure to properly screen applicants for the position of police officer with the City of Atlanta; failure to supervise police officers; failure to train police officers

10

in dealing with minors and Spanish-speaking immigrants; failure to
investigate allegations of misconduct similar to that alleged in this Complaint;
failure to discipline police officers who engage in conduct similar to that
alleged in this complaint.

*Id.*, ¶¶ 150, 161. These allegations meet the elements of municipal liability set forth in

*Canton*; that is, Plaintiff suffered constitutional injury, the City had deficient policies, and

those policies were the cause of Plaintiff's injuries. Therefore, the court cannot dismiss

Plaintiff's municipal liability claims against the City of Atlanta at this stage in the litigation.

*Grech v. Clayton County*, 335 F.3d 1326 (11th Cir. 2003), cited by Defendant Atlanta, was

before the court on a motion for summary judgment, and therefore, does not apply to

pleading requirements at the motion to dismiss stage. The court denies Defendant City of

Atlanta's motion to dismiss § 1983 claims.

### D.    Violations of International Law

Plaintiff's claims under international law raise a host of complicated issues that

neither party has fully explored in their short briefs. The first issue – and one that has not

been explored at any length in case law – is the extent to which a domestic actor, such as

a police officer or city government, can be held liable under the Alien Tort Statute. The

second issue is whether the facts as alleged by Plaintiff rise to the level of a violation of "the

law of nations."

Briefly stated, the Alien Tort Statute, codified at 28 U.S.C. § 1350 (formally known

as the Alien Torts Claims Act), states: "The district courts shall have original jurisdiction

11

of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The Alien Tort Statute was enacted as part of the Judiciary Act of 1789 and went largely unnoticed for 200 years, until the Second Circuit held in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), that deliberate torture under the color of authority violated human rights law and that such a violation of human rights law could constitute a violation of domestic law arising under § 1350.

Notably, the Alien Tort Statute fails to describe the potential group of defendants. A related statute, the Torture Victim Protection Act, passed in 1991, does describe the potential group of defendants. That statute, appended as a statutory note to the Alien Tort Statute at 28 U.S.C. § 1350, creates a cause of action for damages against "[a]n individual who, under actual or apparent authority, or color of law, of ***any foreign nation*** . . . subjects an individual to torture." *Id.*, § 1350 note (a)(1) (emphasis added); *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246-47 (11th Cir. 2005). Plaintiff, here, however, specifically disavows any claim under the Torture Victim Protection Act, and such a claim would not be viable as Defendants are not acting under the color of law of any foreign nation. The court's analysis, therefore, focuses on the Alien Tort Statute.

The court finds it telling that of the significant amount of litigation conducted pursuant to § 1350 since the Second Circuit's opinion in *Filartega*, there is no reported case that directly discusses whether domestic actors can be held liable under the Alien Tort

12

Statute. Rather, the cases primarily focus on (1) whether the Alien Tort Statute is more than simply jurisdiction granting, (2) what torts are actionable under the Alien Tort Statute, (3) whether foreign individuals can be sued under the Alien Tort Statute in U.S. Courts, and (4) whether and how U.S. corporations operating in foreign countries can be held liable under the statute for acts committed by foreign governments or agents of foreign governments when the corporation is allegedly acting in some manner in concert with the governments.

The very few cases brought against domestic U.S. actors go straight to a sovereign immunity or merits analysis without considering whether a cause of action against a domestic actor can – or should – be brought under the Alien Tort Statute. For example, in *Mora v. New York*, 524 F.3d 183 (2d Cir. 2008), the plaintiff foreign national filed a civil rights action against officials of the State of New York alleging a violation of Article 36 of the Vienna Convention on Consular Relations because those officials did not notify the plaintiff that he could contact his consulate after he was arrested in New York and that such failure to notify violated customary international law such that it constituted a tort of unlawful detention under the Alien Tort Statute. The court ultimately determined that the plaintiff's allegations were not sufficient to amount to a tort in violation of customary international law. *Id.* at 208; *see also Koohi v. United States*, 976 F.2d 1328, 1332 n.4 (9th Cir. 1992) (noting that Alien Tort Statute does not constitute a waiver of sovereign immunity); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992)

13

("[A]ny party asserting jurisdiction under the Alien Tort Statute must establish, independent of that statute, that the United States has consented to suit"); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.D. Cir. 1985) (same); *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980) (same); *El-Shifa Pharmaceutical Indus. Co. v. United States*, 402 F. Supp. 2d 267 (D.D.C. 2005) (same and Administrative Procedures Act does not waive sovereign immunity); *Jama v. United States Immigration & Naturalization Service*, 22 F. Supp. 2d 353 (D.N.J. 1998) (same).

While there is nothing in the language of the Alien Tort Statute that precludes its use against domestic U.S. actors, there are obvious reasons why allowing domestic actors to be held liable under the Alien Tort Statute would result in a significant change to the legal landscape. If courts were to recognize the applicability of § 1350 to domestic situations, then every encounter of an alien with a police officer will become not just a "federal case," but an "international case." This would require federal courts to not only determine whether a plaintiff's cause of action against police officers, to take one example, states a federal constitutional claim – a complicated exercise in itself – but also whether the actions state a claim under international law.[2]

---

[2]The intersection of customary international law with domestic law is complicated and highly debated. The Supreme Court's opinion in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), provides some insight into this debate, as does a series of law review articles. *See*, *e.g.*, Harold Hongju Koh, *Is International Law Really State Law?*, 111 Harv. L. Rev. 1824 (1998), and Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 Harv. L. Rev. 815 (1997).

14

The Supreme Court, in part, recognized this danger in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). There, the plaintiff, Alvarez, a Mexican national, alleged that he was abducted in Mexico by U.S. Drug Enforcement Agents and transported to the United States to face murder charges. After being acquitted on those charges, Alvarez filed suit pursuant to the Alien Tort Statute and the Federal Tort Claims Act, against the United States, the agents, Mexican policemen, and Mexican civilians, alleging that the defendants violated his civil rights. The Court considered whether Alvarez's claim of arbitrary detention fit within the "torts" contemplated by the Alien Tort Statute. The Court stated:

> Alvarez thus invokes a general prohibition of "arbitrary" detention defined as officially sanctioned action exceeding positive authorization to detain under the domestic law of some government, regardless of the circumstances. Whether or not this is an accurate reading of the Covenant, Alvarez cites little authority that a rule so broad has the status of a binding customary norm today. He certainly cites nothing to justify the federal courts in taking his broad rule as the predicate for a federal lawsuit, for its implications would be breathtaking. His rule would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under Rev. Stat. § 1979, 42 U.S.C. § 1983, and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), that now provide damages for such violations. It would create an action in federal court for arrests by state officers who simply exceeded their authority; and for the violation of any limit that the law of any country might place on the authority of its own officers to arrest. And all of this assumes that Alvarez could establish that Sosa was acting on behalf of a government when he made the arrest, for otherwise he would need a rule broader still.

AO 72A
(Rev.8/82)

*Id.* at 736-37. Not only does this passage demonstrate a concern for overreaching under the Alien Tort Statute, but it also speaks directly to the court's concern about whether the law should reach to the Alien Tort Statute when Plaintiff's claims here are clearly cognizable under the Fourth Amendment. It is not to ignore the serious nature of Plaintiff's claims to state that they are not a matter of "international law" when they are clearly covered by federal constitutional law. *See also Romero v. Drummond Co.*, 2008 WL 5274192, ___ F.3d ___ (11th Cir. Dec. 22, 2008) (under "the Alien Tort Statute, state actors are the main objects of the law of nations, but individuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under the color of law of a foreign nation," and thus implying involvement of a foreign nation is generally expected under Alien Tort Statute).

In sum, the court finds that Defendants Richardson and City of Atlanta are not appropriate defendants under the Alien Tort Statute with respect to injuries resulting from an allegedly constitutionally deficient interaction between the alien and a police officer.

In the alternative, the court considers whether Plaintiff's allegations are sufficient to state a cause of action under § 1350. To state a claim under the Alien Tort Statute, a plaintiff must (1) be an alien, (2) suing for a tort, which was (3) committed in violation of international law. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005). In his complaint, Plaintiff alleges three torts under the "law of nations": (1)

16

torture, (2) cruel, inhuman, and degrading treatment or punishment, and (3) arbitrary detention. In its motion to dismiss, the City of Atlanta contends that the facts as alleged in Plaintiff's complaint fail to raise a claim under international law. Plaintiff points to no specific source of international norms in response to Defendant's motion to dismiss, but rather simply argues that § 1350 is jurisdictional and permits Plaintiff to raise *jus cogens* claims under international law.

In *Sosa*, the Supreme Court explained that although the Alien Tort Act is jurisdictional in nature, it also provides a cause of action "for the modest number of international law violations with a potential for personal liability at the time [of its enactment]." *Sosa*, 542 U.S. at 724.[3] The Court, however, warned that federal courts should exercise "great caution" when considering new causes of action and maintain "vigilant doorkeeping . . . thus [opening the door] to a narrow class of international norms [recognized] today." *Id.* at 728-29. The Court explained that the "collateral consequences of making international rules privately actionable argue for judicial caution" and that to provide a cause of action under the Alien Tort Statute, a tort under customary international law must meet a "high bar" for recognizing new causes of action in that it must be both

---

[3]This statement is a bit of an oversimplification. *Sosa* discusses this issue at great length. While the Court held that § 1350 is jurisdictional, it also concluded that the "jurisdictional" statute brings along with it the ability to raise a narrow range of claims under international law similar to those that existed at the time of enactment of the statute.

AO 72A
(Rev.8/82)

specific and well-accepted. *Id.* at 715, 720, 725 (holding that alleged tort must be "defined with a specificity comparable to the features of the 18th-century paradigms" of torts in violation of the law of nations – such as violations of safe conduct, offenses against ambassadors, and piracy and that these examples involve torts "principally incident to whole states or nations and not individuals seeking relief in courts")). *Sosa* also instructs that whether to find a tort actionable under the Alien Tort Statute "involve[s] an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732-33.[4]

The Eleventh Circuit applied *Sosa* in *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246-47 (11th Cir. 2005), where Guatemalan labor unionists sued the U.S. corporate owner of a Guatemalan banana plantation alleging the owner participated in torture and other human rights violations against the unionists. The court specifically rejected the notion that "cruel, inhuman, degrading treatment or punishment" could be a violation under the Alien Tort Act. *See* 416 F.3d at 1247. The court explained that this violation arose out of the International Covenant on Civil and Political Rights, but that *Sosa* holds that the Covenant did not "create obligations enforceable in the federal courts." *Id.* The *Aldana* court also rejected the idea that the plaintiff could raise a claim for "arbitrary

---

[4]Although it did not so hold, the Supreme Court also suggested in *Sosa* that exhaustion might be a requirement before bringing a claim under the Alien Tort Statute. *See* 542 U.S. at 733 n.21 (citing to brief of amicus European Commission).

18

detention," finding that under *Sosa*, "a single illegal detention of less than a day . . . violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id.*

*Aldana* would seem to provide sufficient precedential basis for a conclusion that Plaintiff's cruel, inhuman, degrading treatment or punishment and arbitrary detention claims are not sufficient to establish a violation of a norm of customary international law. Plaintiff, however, claims that international law protection under these two notions is broader for minors, which he was at the time of his interaction with Officer Richardson. Without citation in his complaint, and without any additional briefing in response to Defendant's motion to dismiss, Plaintiff claims that international law protections are broader for minors than adults. Therefore, despite the fact that *Sosa* and *Aldana* rejected claims of arbitrary detention and cruel, inhuman, degrading treatment or punishment under the Alien Tort Statute, Plaintiff argues the protections are still available for minors.

The court can locate no specific support for this contention with respect to these two potential violations of the law of nations. Further, the Supreme Court has noted in general that the United States has not ratified the United Nations Convention on the Rights of the Child, which might arguably give broader human rights protection to minors. *See Roper v. Simmons*, 543 U.S. 551, 576 (2005). *Sosa* holds that violations of the laws of nations brought under § 1350 must be specific and well-accepted. *See* 542 U.S. at 715, 720, 725.

19

Plaintiff has not demonstrated that his claims of arbitrary detention of a minor and cruel, inhuman, degrading treatment or punishment of a minor meet this high bar.

In contrast, the *Aldana* court did recognize that "state-sponsored torture" "likely violates international law and is therefore actionable under the Alien Tort Act." *Aldana*, 416 F.3d at 1247-48. In construing the state action requirement, the court should look "to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983." *Id.* (citing *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995)). Further, state-sponsored torture under the Alien Tort Act "may be based on indirect liability as well as direct liability." *Id.* The court, however, concluded that the plaintiffs had not sufficiently plead that the torture was "state sponsored" because they only alleged that Guatemala had registered and tolerated the private security forces accused of harming plaintiffs. *Id.* at 1248. Further, "police inaction" in response to events not occurring within their plain sight was not sufficient to establish state action. *Id.* The court did find, however, that the plaintiffs sufficiently pled a claim against the Mayor of Morales District because he was alleged to be an "armed aggressor" and not merely an observer. *Id.* at 1249. The mayor's involvement could be sufficient to establish state action. *Id.*

*Aldana* then went on to define "torture" under "international law" such that it could be raised via § 1350. The court referred to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment which defines torture as

20

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.  It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

*Id.* at 1251.  The plaintiffs in *Aldana* alleged that they were captured by the security force and were threatened with imminent death because of their work with the labor union. Several were filmed with a video camera and told to give their "last messages." They were also told that a member of the security forces wanted to take a "clear photo" of their faces before he killed them.  Numerous other threats were made to the plaintiffs by heavily armed members of the security forces.  The plaintiffs alleged they continued to suffer from extreme and severe mental anguish and emotional distress.  Based on these allegations, the court denied Defendants' motion to dismiss for failure to state a claim of torture.

The Eleventh Circuit has not undertaken a more exhaustive consideration of what constitutes "torture" for the purposes of the Alien Tort Statute.  Other circuits considering the Torture Victim Protection Act, which also draws its definition of torture from the Convention on Torture, note that "only acts of a certain gravity shall be considered to constitute torture."  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002) (holding that "severity requirement" of statute is "crucial to ensuring

AO 72A
(Rev.8/82)

that the conduct proscribed by the Convention and the [Torture Victim Protection Act] is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes"). The *Price* court further noted that the

> critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture. *See* S. Exec. Rep. No. 101-30, at 15 ("The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.") (internal quotation marks omitted). ***This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault. Not all police brutality, not every instance of excessive force used against prisoners, is torture under the [Foreign Sovereign Immunities Act applying Convention Against Torture].***

*Id.* at 93 (emphasis added) (dismissing torture claim even where complaint alleged "kicking, clubbing, and beatings" because no way to determine severity from those statements alone).

Other cases note that "torture is a label that is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003) (allegations that Libyan authorities forcibly removed victims from cruise ship, held them captive for months, threatened them with death, held them incommunicado from one another, while "reflecting a bent toward cruelty," were not sufficient to satisfy high bar of "torture"). *Compare Abebe-Jira v. Negewo*, 72 F.3d 844,

22

845 (11th Cir. 1996) (detaining victim, forcing her to undress, binding her legs and arms, and whipping her on legs and back with wire and threatening her with death constituted torture); *Liobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457 (S.D.N.Y. 2006) (plaintiffs stated claim for torture where they alleged they were shot, raped, beaten with various instruments, stripped of their clothing, tied up, forced to lie for hours in tropical sun, sprayed with chemicals and denied adequate food, medical care, and sanitary facilities).

Based on this review of case law, the court concludes that Plaintiff's allegations here are not sufficient to constitute "torture" under the Alien Tort Statute. Again, this is not to state that Plaintiff's allegations are not serious and as alleged are sufficient get beyond the motion to dismiss stage under the Fourth Amendment, but, rather, states only that they are not sufficient to state a claim of "torture" under the law of nations. Therefore, the court grants Defendant's motion to dismiss Plaintiff's "law of nations" claims.

In sum, Plaintiff's official capacity claims against Defendant Richardson are dismissed. Plaintiff's state law claims against Defendant City of Atlanta are barred under sovereign immunity. Plaintiff's complaint sufficiently pleads § 1983 liability against the City of Atlanta. Plaintiff's federal constitutional claims under § 1983 against both Defendants City of Atlanta and Defendant Richardson arise only under the Fourth Amendment and not the Fourteenth. Plaintiff's complaint fails to state a cause of action for

AO 72A
(Rev.8/82)

torture; arbitrary detention; or cruel, inhuman or degrading treatment, and thus, his "law of nations" claims are dismissed.

**III.    Conclusion**

The court GRANTS IN PART AND DENIES IN PART Defendant City of Atlanta's motion to dismiss [4].


**IT IS SO ORDERED** this 12th day of August 2009.


_____/s J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)

AO 72A
(Rev.8/82)